John Scott BECHTEL,*
Plaintiff–Appellee,

United States Department of Labor, Intervenor–Plaintiff–Appellee,

v.

COMPETITIVE TECHNOLOGIES, INC., Defendant–Appellant.

Docket No. 05–2404–CV.

United States Court of Appeals, Second Circuit.

Argued: Dec. 21, 2005.

Decided: May 1, 2006.

---

* The Clerk is requested to modify the official caption to reflect that Willie Jacques, Jr. is no longer a party to this appeal.

David B. Zabel, Cohen & Wolf, P.C., Bridgeport, CT (Mary E. Pivec, Sheppard

Mullin Richter & Hampton, LLP, Washington, DC, on the brief), for Defendant–Appellant.

Megan E. Guenther, Attorney (Howard M. Radzely, Solicitor of Labor, Steven J. Mandel, Associate Solicitor, Ellen R. Edmond, Senior Attorney, on the brief), U.S. Department of Labor, Washington, DC, for Intervenor–Plaintiff–Appellee.

Robert L. Bauman (Taylor Spalding Flanery, on the brief), Gambs Mucker & Bauman, Lafayette, IN, for Plaintiff–Appellee.

Before: JACOBS, LEVAL, STRAUB, Circuit Judges.

Judge LEVAL concurs in the judgment in a separate opinion.

Judge STRAUB dissents in a separate opinion.

DENNIS JACOBS, Circuit Judge:

Competitive Technologies, Inc. ("CTI") appeals from a judgment of the United States District Court for the District of Connecticut (Covello, *J.*) granting the applications of John Scott Bechtel and Willie Jacques, Jr.[1] for a preliminary injunction ordering CTI to reinstate them as CTI vice presidents. Bechtel sues to enforce the preliminary order of reinstatement issued by the Secretary of Labor ("Secretary") upon a finding that Bechtel's firing violated 18 U.S.C. § 1514A, which is § 806 of the Sarbanes–Oxley Act of 2002. We vacate the injunction, and direct the district court to dismiss this action.

Bechtel filed a complaint with the Secretary pursuant to 18 U.S.C. § 1514A(b)(1)(A), alleging that the reason CTI discharged him on June 30, 2003 was

1. CTI has settled its dispute with Jacques, and he is no longer a party to this appeal.

that he had raised concerns with management about CTI's financial reporting. On February 2, 2005, the Secretary issued a preliminary order finding that Bechtel's expression of concern is activity protected by § 1514A and ordering reinstatement. CTI duly objected to the order, and requested a hearing before an administrative law judge ("ALJ"). *See* 49 U.S.C. § 42121(b)(2)(A); 29 C.F.R. § 1980.107. As of the date of this opinion, the Secretary has not issued a final order.

CTI's objection to the Secretary's preliminary order does not stay the reinstatement remedy, *see* 49 U.S.C. § 42121(b)(2)(A); 29 C.F.R. § 1980.106; nevertheless, CTI has refused to take Bechtel back.

On April 18, 2005, Bechtel filed a complaint in the district court seeking a preliminary injunction requiring CTI to comply with the reinstatement remedy in the preliminary order; the district court issued the requested injunction on May 13, 2005.[2] CTI appeals from the district court judgment, asserting that (i) the district court lacked jurisdiction to enforce the preliminary order and (ii) in the event that the district court had such jurisdiction, the Secretary's investigation of Bechtel's complaint violated CTI's constitutional right to due process.

**I**

■ CTI argues that 18 U.S.C. § 1514A does not confer power on district courts to enforce preliminary orders. "When reviewing a district court's determination of its subject matter jurisdiction, we review . . . legal conclusions *de novo.*" *McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage),* 59 F.3d 9, 11 (2d Cir.1995).

■ The power of the inferior federal courts is "limited to those subjects encompassed within a statutory grant of jurisdiction." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 701, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Even when the exercise of "[federal] judicial power is desirable or expedient," jurisdiction does not lie absent statutory authorization. *United States v. N. Hempstead,* 610 F.2d 1025, 1029 (2d Cir. 1979).

■ "Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well." *United States v. Gayle,* 342 F.3d 89, 92 (2d Cir.2003); *see also Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 236, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). At the same time, "we must 'interpret [a] specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.'" *United States v. Pacheco,* 225 F.3d 148, 154 (2d Cir.2000) (quoting *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 24 (2d Cir.1989)). We "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted).

■ There are three provisions of § 1514A that provide for federal power to enforce actions related to complaints under the statute. None of them authorizes enforcement of preliminary orders.

Of the three, two incorporate provisions of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"), 49 U.S.C. § 42121(b) (*see* 18 U.S.C. § 1514A(b)(2)(A), incorporating by

---

**2.** The facts of this case are set forth more fully in the district court opinion, reported at *Bech-* *tel v. Competitive Technologies,* 369 F.Supp.2d 233 (D.Conn.2005).

reference provisions of 49 U.S.C. § 42121(b)): AIR21 paragraph (b)(5) and subparagraph (b)(6)(A) authorize district court jurisdiction over actions brought by the Secretary and private parties, respectively, to grant all appropriate relief, including injunctive relief, when there has been a failure of compliance with an order "issued under paragraph (b)(3)" (text in margin[3]). The reference is to AIR21 paragraph (b)(3), entitled "Final Order."[4] Subparagraph (b)(3)(A) specifies when the Secretary must "issue a final order providing the relief prescribed by this paragraph or denying the complaint"; subparagraph (b)(3)(B) authorizes specific remedies for inclusion in final orders upon a finding of a violation; and subsection (b)(3)(C) specifies procedures for dealing with frivolous complaints.

If the Secretary has not issued a final decision within 180 days of the filing of the administrative complaint, the third provision of 18 U.S.C. § 1514A, subparagraph (b)(1)(B), authorizes jurisdiction in district court over an action for *de novo* review seeking remedial relief.[5]

None of the provisions of 18 U.S.C. § 1514A authorizing judicial enforcement reference AIR21 subparagraph (b)(2)(A), under which the Secretary issues prelimi-

---

3. 49 U.S.C. § 42121(b)(5) and (b)(6)(A) read in pertinent part:

(5) Enforcement of order by Secretary of Labor. Whenever any person has failed to comply with an order issued under paragraph [b](3), the Secretary of Labor may file a civil action in the United States district court for the district in which the violation was found to occur to enforce such order. In actions brought under this paragraph, the district courts shall have jurisdiction to grant all appropriate relief including, but not limited to, injunctive relief and compensatory damages.
(6) Enforcement of order by parties.
(A) Commencement of action. A person on whose behalf an order was issued under paragraph [b](3) may commence a civil action against the person to whom such order was issued to require compliance with such order. The appropriate United States district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such order.

4. 49 U.S.C. § 42121(b)(3) reads in pertinent part:

(3) Final order.
(A) Deadline for issuance; settlement agreements. Not later than 120 days after the date of conclusion of a hearing under paragraph (2), the Secretary of Labor shall issue a final order providing the relief prescribed by this paragraph or denying the complaint. . . .

(B) Remedy. If, in response to a complaint filed under paragraph (1), the Secretary of Labor determines that a violation of subsection (a) has occurred, the Secretary of Labor shall order the person who committed such violation to—
(i) take affirmative action to abate the violation;
(ii) reinstate the complainant to his or her former position together with the compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment; and
(iii) provide compensatory damages to the complainant.
* * * *
(C) Frivolous complaints. . . .

5. 18 U.S.C. § 1514A(b)(1) provides in pertinent part:

(1) In general. A person who alleges discharge or other discrimination by any person in violation of subsection (a) may seek relief under subsection (c), by—
. . . .
(B) if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, [bringing] an action at law or equity for *de novo* review in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy.

nary orders.[6] Nor, in the absence of such a specific reference, can any of the potentially relevant statutory text be read reasonably as conferring federal judicial power to enforce orders that are preliminary. I therefore conclude that the district court lacked power to enforce the preliminary order reinstating Bechtel.

## II

The district court ruled that AIR21 paragraph (b)(5) and subparagraph (b)(6)(A) confer jurisdiction on district courts to enforce preliminary orders. As the court observed, AIR21 subparagraph (b)(2)(A) provides that preliminary orders should contain the relief prescribed by subparagraph (b)(3)(B) for final orders. The court reasoned that it therefore had authorization to enforce a preliminary reinstatement order as if the order were final.

I disagree. The plain text of subparagraph (b)(2)(A) incorporates the types of relief specified in subparagraph (b)(3)(B); it nowhere suggests that the two subparagraphs are to be treated identically for federal jurisdictional purposes. *See United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972) (*per curiam*) ("In construing statutes, words are to be given their natural, plain, ordinary and commonly understood meaning unless it is clear that some other meaning was intended."); *see also United States v. Peterson*, 394 F.3d 98, 107 (2d Cir.2005) ("[W]hen Congress uses particular language in one section of a statute and different language in another, we presume *its* word choice was intentional."). It seems improbable that Congress would have chosen to confer federal judicial enforcement power over pre-

liminary orders by indirection and opacity when it easily could have modified the *jurisdictional* provisions of AIR21—paragraph (b)(5) and subparagraph (b)(6)(A)—to encompass subparagraph (b)(2)(A). I therefore conclude that the plain text of the provisions granting enforcement power cannot support a reading that confers on federal courts the power to enforce orders that are preliminary.

In construing the relevant provisions conferring judicial enforcement power, the district court concluded that an interpretation that bars enforcement of preliminary reinstatement orders in district court is inconsistent with the statutory scheme created by 18 U.S.C. § 1514A. This argument gains traction from AIR21 subparagraph (b)(2)(A), which provides that the filing of objections to a preliminary order does "not operate to stay any reinstatement remedy contained in the preliminary order": Why provide that the remedy is unstayed unless there is provision for enforcement without delay?

■ As I have already demonstrated, the statutory language here is clear. But even when the statutory language (and legislative history) is unclear, courts do not automatically assume that judicial power is necessary to enforce statutory rights; the need for enforcement is ascertained in light of other considerations. *See Chicago & N.W.R. Co. v. United Transp. Union*, 402 U.S. 570, 578, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) ("[T]he propriety of judicial enforcement turns on the importance of the duty in the [statutory] scheme . . .[,] the capacity of the courts to enforce it effectively, and the necessity for judicial enforcement if the right of the aggrieved

---

6. 49 U.S.C. § 42121(b)(2)(A) reads in pertinent part:

    If the Secretary of Labor concludes that there is a reasonable cause to believe that a

violation of subsection (a) has occurred, the Secretary shall accompany the Secretary's findings with a preliminary order providing the relief prescribed by paragraph [b](3)(B).

party is not to prove illusory."); *cf. Alexander v. Sandoval,* 532 U.S. 275, 290, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("[S]ome remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights."). Congress does its own weighing when drafting statutes, and is free to put—by design or as an outcome of the legislative process—companies under a legal obligation to reinstate workers without authorizing instantaneous judicial enforcement.

The likelihood that Congress intended such an unenforceable preliminary order here is buttressed by three considerations:

First, 18 U.S.C. § 1514A(b)(1)(B) provides for *de novo* review in the district court if the Secretary has not issued a final decision within 180 days of the filing of the complaint. This remedy reduces any need for a judicial order.

Second, a preliminary order is based on no more than "reasonable cause to believe that the complaint has merit[.]" 49 U.S.C. § 42121(b)(2)(A). That is a tentative and inchoate basis for present enforcement.

Third, a preliminary order remains subject to being overturned by the Secretary's final order or by the district court on appeal from that final order. Given these successive levels of review, the absence of federal judicial power to enforce preliminary orders reasonably could serve to ensure that appeals work their way through the administrative system before the federal courts become involved. Moreover, if the result changes from one level of review to the next, immediate enforcement at each level could cause a rapid sequence of reinstatement and discharge, and a generally ridiculous state of affairs.

Not to the contrary is *Martin v. Yellow Freight Sys., Inc.,* in which we held that the Secretary could enforce in district court an interim order of reinstatement issued by an ALJ (after a full hearing) pursuant to the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105. 983 F.2d 1201, 1203 (2d Cir. 1993). The STAA explicitly conferred jurisdiction on federal district courts over actions brought by the Secretary to enforce both preliminary and final orders. *See* 49 U.S.C. § 31105(d) (conferring district court jurisdiction over actions brought to enforce orders issued under subsection (b), which authorized Secretary to issue both preliminary and final orders).[7] However, the STAA nowhere explicitly authorized actions to enforce *interim* orders. Nevertheless, *Yellow Freight* held that such orders were enforceable, specifically referencing the need to avoid undermining the statutory purpose of protecting whistleblowers.

The reasoning of *Yellow Freight* is inapposite here. *Yellow Freight* relied on statutory wording that expressly conferred power to enforce preliminary orders, construing that wording to encompass interim orders as well. As *Yellow Freight* recognized, it makes sense that a scheme providing for the enforcement of preliminary and final orders would likewise provide for the enforcement of interim orders, given that the power to enforce preliminary orders signifies an intent to involve the federal court system in the enforcement process at an early stage, before the employer has received the procedural protections afforded by a full hearing before an ALJ. 983 F.2d at 1203 (" '[W]e do not feel that it is unreasonable or unanticipated that an ALJ, vested with the authority of the Sec-

7. In explicitly authorizing district court jurisdiction over actions brought to enforce preliminary orders, the STAA thus demonstrates that Congress knew how to provide expressly for such jurisdiction when it thought desirable.

retary of Labor, would issue an order of reinstatement after a full hearing on the merits of the dispute in light of the Secretary's ability to issue a reinstatement order after merely a preliminary investigation.'") (quoting *Martin v. Yellow Freight Sys., Inc.,* 793 F.Supp. 461, 469 (S.D.N.Y. 1992)). No such inference is available in this present case.

Because I conclude that § 1514A confers no judicial enforcement power over preliminary orders of reinstatement, I do not reach the question whether the Secretary's investigation violated CTI's constitutional right to due process. My colleague Judge Leval takes the opposite tack and assumes that § 1514A confers such judicial enforcement power—thus exercising "hypothetical jurisdiction," Concurring Op. at 479 n. 1— in order to decide that the Secretary's investigation did violate CTI's right to due process. I think this analysis proceeds backwards. Judge Leval evaluates the procedures afforded CTI by the standards established in *Brock v. Roadway Express, Inc.,* 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987), in which the Supreme Court determined that, due to inadequate procedures, an employee's reinstatement pursuant to a preliminary order under § 405 of the STAA constituted a violation of the employer's right to due process. But *Brock* furnishes no basis for an exercise of "hypothetical jurisdiction" here:

Even assuming that an unenforceable preliminary order of reinstatement constitutes a deprivation of property, the question whether the Secretary's investigation violated CTI's right to due process depends for its answer on whether the resulting preliminary order is judicially enforceable.[8]

■ "A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. N.W. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *see also Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, *J.,* concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.") (citing *Siler v. Louisville & N.R. Co.,* 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753 (1909) & *Light v. United States,* 220 U.S. 523, 538, 31 S.Ct. 485, 55 L.Ed. 570 (1911)). Here, the non-constitutional basis for decision (the question of statutory judicial enforcement power), while complex and difficult, has the potential to fairly dispose of the case. Nor is this a situation in which the constitutional issue "cannot be avoided."[9] *Fry*

---

**8.** The procedures required under *Brock* are derived from application of the *Mathews v. Eldridge* balancing test in the context of a statute that did authorize judicial enforcement of preliminary reinstatement orders, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see Brock,* 481 U.S. at 261–68, 107 S.Ct. 1740. *Brock* does not control where there is no such enforcement, since the private interests at stake, *see Mathews,* 424 U.S. at 339–43, 96 S.Ct. 893, will presumably differ depending on whether the preliminary order of reinstatement is enforceable. Indeed, Judge Leval's contention that the order has essentially *no* legal effect in the absence of

judicial enforcement, *see* Concurring Op. at 477, suggests that the private interest at stake in the absence of judicial enforcement is quite minimal.

**9.** Two of the Second Circuit cases cited by Judge Leval, *see* Concurring Op. at 479 – 80 n. 1, involve the assertion of hypothetical jurisdiction to decide constitutional questions. *See Guaylupo–Moya v. Gonzales,* 423 F.3d 121, 132 (2d Cir.2005); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 817 (2d Cir.2000). In neither case, however, did the question of statutory jurisdiction bear upon the *ultimate* conclusion that the constitutional claim was

v. *UAL Corp.*, 84 F.3d 936, 939 (7th Cir. 1996) (Posner, *C.J.*).

I therefore decline to assume statutory judicial enforcement power in order to determine whether a close, avoidable constitutional claim is meritorious, when that determination is likely controlled by whether there is enforcement power.

Since Judge Leval and I nevertheless concur in the decree, the preliminary injunction is vacated, and the case is remanded for entry of an order of dismissal.

LEVAL, Circuit Judge, concurring in the judgment.

This case presents a very difficult question: Whether § 806 of Sarbanes–Oxley, 18 U.S.C. § 1514A, confers authority on a district court to enforce a preliminary order of reinstatement. I find it unnecessary to answer this question. Even if § 806 authorizes a district court to enforce a preliminary order of reinstatement issued in compliance with the obligations of due process, the preliminary order in this case is not enforceable, in my view, because the Secretary's disclosures to CTI during its investigation of Bechtel's allegations did not satisfy the due process requirements of *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987).

## I.

Complaints filed with the Secretary of Labor concerning violations of the whistle-blower-protection provisions of § 806 are governed by provisions of AIR21(b), 49 U.S.C. § 42121(b). 18 U.S.C. § 1514A(b)(2)(A). Under paragraph (5) and subparagraph (6)(A) of AIR21(b), a district court is authorized to enforce an order of the Secretary of Labor "issued under paragraph (3)." Paragraph (3), entitled "Final order," provides in relevant part that if the Secretary of Labor makes a final determination that a violation has occurred, the Secretary "shall order the person who committed such violation to ... reinstate the complainant to his or her former position together with the compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment." 49 U.S.C. § 42121(b)(3)(B). Thus, a district court is clearly authorized to enforce a final reinstatement order issued under paragraph (3).

In this case, however, we are asked to decide whether a district court has authority to enforce a preliminary reinstatement order. Under paragraph (2) of AIR21(b), entitled "Investigation; preliminary order," if the Secretary determines that "there is reasonable cause to believe that the complaint has merit," then the Secretary must make written findings and accompany those findings with "a preliminary order providing the relief prescribed by paragraph (3)(B)." 49 U.S.C. § 42121(b)(2)(A). Within thirty days, either party "may file objections to the findings or preliminary order, or both, and request a hearing on the record." *Id.* The statute provides that "the filing of such objections shall not operate to stay any reinstatement remedy contained in the preliminary order." *Id.*

The plaintiff and the Secretary contend that such a preliminary order of reinstatement qualifies as an enforceable order "issued under paragraph (3)" because it provides the relief prescribed by paragraph (3)(B). The defendant contends that such a preliminary order is issued under paragraph (2), even though it provides for the kind of relief prescribed by paragraph (3).

"plainly without merit." *Marquez–Almanzar v. INS*, 418 F.3d 210, 216 (2d Cir.2005).

The statute, no matter how it is read, does not make complete sense. As I read the opposing arguments of my colleagues, certain provisions of the statute favor each of their arguments, while other provisions disfavor them.

As Judge Jacobs argues, the fact that a preliminary order authorized by paragraph (2) "provid[es] the relief prescribed by paragraph (3)(B)" does not mean that the preliminary order is an order "issued under paragraph (3)." The source of the authority for a preliminary order of reinstatement is paragraph (2), not paragraph (3). Such an order therefore appears to be "issued under" paragraph (2). The references in paragraph (5) and subparagraph (6)(A) to the enforcement of an order issued under paragraph (3) do not seem to apply to such an order. *See Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 16 n. 16, 17 (1st Cir.2006) (stating in dictum that paragraph (5) and subparagraph (6)(A) authorize district court enforcement of the Secretary's "final order"). Moreover, paragraph (5) provides that the civil action of the Secretary seeking enforcement of the order "issued under paragraph (3)" may be filed "in the United States district court for the district in which the violation *was found to occur.*" (emphasis added). A violation, however, has not been "found to occur" until the Secretary issues a final order; the preliminary order is based only on reasonable cause, not on a finding that the violation has occurred.

Further support for this reading of the statute is found in subparagraph (4)(A), which states that "[a]ny person adversely affected or aggrieved by an order issued under paragraph (3) may obtain review of the order in the United States Court of Appeals." In *Bell v. New Jersey*, 461 U.S. 773, 778, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983), the Supreme Court stated that

"[t]he strong presumption is that judicial review [of agency decisions] will become available only when agency action becomes final." That presumption supports the proposition that "an order issued under paragraph (3)," which is subject to immediate review in the court of appeals, does not include a preliminary order of reinstatement. *See Carnero*, 433 F.3d at 16 n. 16 (stating in dictum that AIR21 provides for "appellate court review of the Secretary's final order"); *Stone v. Duke Energy Corp.*, 432 F.3d 320 (4th Cir.2005) (assuming that only a final order is appealable under paragraph (4)).

On the other hand, as Judge Straub observes, AIR21 states that a preliminary order of reinstatement is not stayed pending the final order of the Secretary. The absence of a stay presumably makes some difference in the regulatory scheme. Yet if the preliminary order is not enforceable, an employer, as in this case, is free to refuse to reinstate the employee. It is as if the preliminary order of reinstatement were stayed pending a final order. Judge Jacobs' reading of the statute, which follows from the plain meaning of paragraph (5) and subparagraph (6)(A) and the presumption against review of non-final agency orders, is not easily reconciled with the provision that there is no stay of a preliminary order of reinstatement. Judge Straub's reading of the statute, which makes better sense of the statute's express denial of a stay of a preliminary order of reinstatement, is difficult to reconcile with the stated scope of enforcement under AIR21 and is counter to the presumption against review of non-final agency orders.

Judge Jacobs offers several explanations as to why the absence of enforcement of the preliminary order makes sense in light of various features of the statutory scheme-the complainant may bring an action in the district court if the Secretary

has not issued a final order after 180 days, the preliminary order is based on a reasonable cause determination, and it is subject to being overturned at multiple stages of review. I believe Judge Straub demonstrates that these arguments are overstated. *See* Dissenting Op. at 487. And even if Judge Jacobs is correct that there are good reasons why a preliminary order should not be enforced, these considerations do not explain why Congress would provide that a preliminary order is not stayed if despite the statute's denial of a stay, the employer without adverse consequence may effectively stay the order simply by declining to obey it.

Judge Straub argues that his reading of the statute is supported by the legislative history of Sarbanes–Oxley. Dissenting Op. at 485 – 86. The legislative history undoubtedly shows an intent to protect whistleblowers. But Judge Straub points to no language in the legislative history which addresses in any way the enforceability of a preliminary order of reinstatement.

Judge Straub rests his argument in part on a regulation promulgated by the Secretary, 29 C.F.R. § 1980.113, which states:

Whenever any person has failed to comply with a preliminary order of reinstatement or a final order or the terms of a settlement agreement, the Secretary or a person on whose behalf the order was issued may file a civil action seeking enforcement of the order in the United States district court for the district in which the violation was found to have occurred.

In this regulation, the Secretary interprets paragraph (5) and subparagraph (6)(A) to provide for enforcement of a preliminary order. However, because the statutory interpretation at issue concerns the scope of federal court jurisdiction, it is not a proper subject of deference under *Chevron*

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Verizon Maryland, Inc. v. Global Naps, Inc.*, 377 F.3d 355, 383 (4th Cir.2004) ("*Chevron* deference is not required when the ultimate question is about federal jurisdiction. Analogous to our obligation to inquire *sua sponte* whenever federal jurisdiction is in doubt, a federal court must interpret statutory grants of jurisdiction for itself." (citation omitted)); *Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 478 (D.C.Cir.2001) ("*Chevron* does not apply to statutes that . . . confer jurisdiction on the federal courts. It is well established that [i]nterpreting statutes granting jurisdiction to Article III courts is exclusively the province of the courts." (internal quotation marks omitted)); *Lopez–Elias v. Reno*, 209 F.3d 788, 791 (5th Cir.2000) ("[T]he fact that courts defer to the INS's construction of its statutory powers of deportation does not mean that similar deference is warranted with respect to the enforcement of this court's jurisdictional limitations. The former may trigger deference, but the determination of our jurisdiction is exclusively for the court to decide."); *see generally Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–50, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990).

Judge Straub argues that the Secretary's interpretation is entitled to "some minimal deference" under *United States v. Mead*, 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Dissenting Op. at 487. The *Mead* Court, citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), held that even when an administrative agency's statutory interpretation is not entitled to *Chevron* deference because there is "no indication that Congress intended such a ruling to carry the force of law," that statutory interpretation "is eligible to claim respect

according to its persuasiveness." *Mead*, 533 U.S. at 221, 121 S.Ct. 2164; *see Skidmore*, 323 U.S. at 140, 65 S.Ct. 161 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."). I do not find the Secretary's interpretation to have persuasive force. The regulations implementing § 806 of Sarbanes–Oxley result in an inconsistent reading of the words "order issued under paragraph (3)" in AIR21. Section 1980.112 of the regulations, entitled "Judicial review," provides in paragraph (a) that

> [w]ithin 60 days after the issuance of a final order by the Board (Secretary) under § 1980.110, any person adversely affected or aggrieved by the order may file a petition for review of the order in the United States Court of Appeals for the circuit in which the violation allegedly occurred or the circuit in which the complainant resided. on the date of the violation. A final order of the Board is not subject to judicial review in any criminal or other civil proceeding.

29 C.F.R. § 1980.112(a). The regulation seems to interpret paragraph (4) of AIR21(b), which provides for review of "an order issued under paragraph (3)," to apply only to review of a final agency order; the regulations contain no provision for immediate review of a preliminary order in the Court of Appeals. Thus, according to the Secretary's reading of AIR21, a preliminary order of reinstatement is an order issued under paragraph (3) for purposes of judicial enforcement but is not an order issued under paragraph (3) for purposes of judicial review. I do not find so inconsistent an interpretation of AIR21 to be persuasive.

## II.

I find it unnecessary *in this case* to resolve the very difficult question of enforceability under a statute which contains apparently inconsistent provisions. This is because, in my view, the Secretary's disclosures to CTI prior to the issuance of the preliminary order did not meet the due process requirements of *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987). Regardless of whether a preliminary order of reinstatement under § 806 is generally enforceable by a federal court, *this* preliminary order is not enforceable. Even if I agreed with Judge Straub that AIR21 authorizes judicial enforcement of a preliminary order of reinstatement (and that therefore § 806 does the same), this conclusion would, in my view, have no effect on the outcome of this case. Rather than unnecessarily reaching a thorny question of statutory interpretation, I leave the resolution of this problem to a future case in which the outcome depends on the resolution of that problem.[1]

---

1. In order to secure judicial enforcement of the Secretary's preliminary order of reinstatement, Bechtel must satisfy several elements, which include that Congress has provided statutory authority for judicial enforcement of such an order and that the order was issued in compliance with law. Because I find the Secretary's order was not issued in compliance with the requirements prescribed in *Brock*, I conclude Bechtel has failed to show entitlement to enforcement regardless of whether Congress authorized such judicial enforcement. Such a ruling is sometimes called an exercise of "hypothetical jurisdiction." As our ruling does not purport to adjudicate ultimate rights as between the parties, but only the enforceability of an interim order, it is not so clear that the concept of assertion of hypothetical jurisdiction is apt. In any event, while *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), severely re-

In *Brock*, the Supreme Court considered whether Roadway Express, an interstate trucking company, was denied due process when a terminated employee was reinstated pursuant to a preliminary reinstatement order under § 405 of the Surface Transportation Assistance Act of 1982 ("STAA"). The employee alleged that he had been improperly terminated for complaining of safety violations. The STAA provided that if the Secretary of Labor found that the employee's claim was supported by reasonable cause, the Secretary was to issue a preliminary order reinstating him. Prior to the preliminary reinstatement order, Roadway was informed of the allegations in the employee's complaint, given the opportunity to meet with an investigator from the Occupational Safety and Health Administration ("OSHA"), and submitted a written statement explaining that the employee had not been discharged for whistleblowing activities. Roadway was not provided with the names of witnesses supporting the employee's claim or the substance of their statements. *Id.* at 255–56, 107 S.Ct. 1740. Roadway sought an injunction against enforcement of the preliminary order of reinstatement, arguing that due process required that the Secretary conduct an evidentiary hearing before granting a preliminary order of reinstatement.

In *Brock*, a majority of the Justices held that due process did not require an evidentiary hearing prior to the preliminary reinstatement order. However, a different majority held that Roadway's due process rights had been violated because it was not informed, prior to the preliminary reinstatement order, what evidence had been submitted to the Secretary in support of the employee's allegations. Justice Marshall, joined by three other justices, wrote that "minimum due process for the employer in this context requires notice of the employee's allegations, *notice of the substance of the relevant supporting evidence*, an opportunity to submit a written response, and an opportunity to meet with the investigator and present statements from rebuttal witnesses." *Id.* at 264, 107 S.Ct. 1740 (emphasis added). Justice Brennan, concurring in part and dissenting in part, agreed that due process required the Secretary of Labor to inform the em-

---

stricts our ability to exercise hypothetical *Article III* jurisdiction over a dispute that does not come within the scope of constitutional "Cases" or "Controversies," that precedent does not restrict our authority to dismiss on the merits cases that come within our constitutional jurisdiction, notwithstanding doubts as to whether we have statutory jurisdiction. This court has repeatedly exercised such hypothetical *statutory* jurisdiction. *See, e.g., Guaylupo–Moya v. Gonzales*, 423 F.3d 121, 132 n. 10 (2d Cir.2005); *Marquez–Almanzar v. INS*, 418 F.3d 210, 216 n. 7 (2d Cir.2005); *United States v. Miller*, 263 F.3d 1, 4 n. 2 (2d Cir.2001); *Fama v. Comm'r of Corr. Srvs.*, 235 F.3d 804, 817 n. 11 (2d Cir.2000). In this case, the district court certainly had Article III jurisdiction, and therefore hypothetical jurisdiction is not precluded by *Steel Co.* I would also observe that the phrase "hypothetical jurisdiction" is something of a misnomer. Courts regularly decide cases on the basis of certain dispositive issues, while leaving other issues unresolved. When a court decides a case by going immediately to a merits question, the unanswered question whether the claims arises at the time or is of the type consigned by the governing statute for adjudication is like any other merits issue that need not be resolved in that case. *See Fry v. UAL Corp.*, 84 F.3d 936, 939 (7th Cir.1996) (Posner, C.J.) ("It is true that when Congress makes clear that a statute is not intended to confer rights on a particular class of persons, a suit under the statute by a member of that class does not engage the jurisdiction of the federal courts .... But if the scope of the statute is unclear, the question whether a particular class is protected by it becomes just another issue concerning the merits of the suit and therefore one that the court need not decide if ... another issue is truly dispositive.").

ployer of the "substance of the evidence" supporting the employee's allegations. *Id.* at 269, 107 S.Ct. 1740 (Brennan, J., concurring in part and dissenting in part).

The record in this case demonstrates that the Secretary gave CTI a copy of Bechtel's initial complaint, a description of the allegations, and opportunities to submit written responses to those allegations and to present statements from rebuttal witnesses. An OSHA investigator also met with CTI's counsel on at least two occasions. However, based on the record before us, CTI was not given reasonable notice of the evidence against it. CTI repeatedly asked OSHA to provide it with copies of statements by Bechtel or witness statements that supported Bechtel's allegations. On July 2, 2004, CTI was provided with a two-page purported summary of witness statements. The document, however, does not name *any* of the witnesses against CTI. Nor does it mention the un-

disclosed oral revenue-sharing agreements or whistleblowing regarding those agreements-the very grounds for the preliminary order of reinstatement. Most important, the "summary" is not a summary at all, but a mishmash of disconnected sentences that does not provide a coherent or comprehensible picture of the evidence against CTI.[2] Furthermore, Bechtel subsequently submitted additional statements to the Secretary in August and December of 2004. No summary of these statements was ever provided to CTI in any form.

Determining whether an employer has been provided with notice of the substance of the relevant supporting evidence is necessarily a fact-specific inquiry, and I do not suggest that there is some precise quantum of information that must be provided to an employer in every case. But in this case, I think it is clear that CTI was not afforded reasonable notice of the evi-

---

**2.** Below is the entirety of the "summary" as it relates to Bechtel (references to Willie Jacques, who also brought a complaint against CTI and was a plaintiff in this case before settling with CTI, have been omitted):
*Job Performance*
● Mr. Bechtel closed one or two agreements with small returns.
● Mr. Bechtel brought in [no] significant revenues.
*Relationship with CEO John Nano*
● CEO Nano pushed . . . Mr. Bechtel to get the job done and bring in revenues.
● Beginning in March 2003 the relationship between CEO Nano . . . and Mr. Bechtel became unprofessional and unproductive.
*Disclosure Committee*
● Mr. Bechtel [was] not [an] official member[ ] of the Disclosure Committee but [was] required to sign off on the SEC reports.
● Committee had to answer 59 questions on each quarterly report and review all agreements.
● Any questions that could not be answered at the meeting were assigned to a member for follow-up. The results of the follow-up were reported to the Audit Committee not to the person who raised the question.

● The sign-off letter was circulated for signatures following the meeting.
● An exception page could be attached to the sign-off letter if there were still reservations about signing off.
● Mr. Bechtel did not sign off on the procedure page.
● Mr. Bechtel initially did not sign off on the March, 2003 report.
*Reasons for Termination*
● Mr. Bechtel [was] let ·go for performance and financial reasons.
● Mr. Bechtel [was] terminated due to restructuring.
● Mr. Bechtel [was] terminated because [he was] coerced into signing something [he did not] want[ ] to sign.
*Contractors*
● CEO Nano hired contractors in summer of 2002 to produce revenue through sales.
● Contractors are easier to terminate than employees.
● No significant revenues have been brought in by contractors.
● 5 contractors have been hired as employees even though there has been no change in the Respondent's financial picture.

dence against it. I conclude that its due process rights were violated.[3]

In her brief to this Court, the Secretary claims that OSHA's June 24, 2004 letter to CTI provided it with the "substance of the evidence that it had collected." Although the letter states that it provides "notice of the substance of the relevant evidence" against CTI, in fact it provides notice of the *allegations* against CTI, not the *evidence* supporting these allegations. As *Brock* clearly states, notice of the allegations is not enough to satisfy due process; notice of the substance of the relevant supporting evidence must be provided to the employer as well. It is only with an awareness of the evidence against it that the employer can respond and attempt to rebut that evidence. Moreover, even if the June 24, 2004 letter had provided notice of the evidence against CTI gathered until that point, the Secretary would still have been obligated to provide CTI with notice of the substance of the additional statements provided by Bechtel in August and December 2004. The Secretary does not even claim to have provided CTI with such notice. Thus, the June 24 letter and the

July 2 "summary" were insufficient to satisfy the Secretary's obligation under *Brock*.[4]

This conclusion does not call into question the procedures generally followed by the Secretary when investigating whistleblower allegations under Sarbanes–Oxley. In fact, in this case the Secretary violated Department of Labor regulations. Under 29 C.F.R. § 1980.104(e) the Secretary was required, "[p]rior to the issuance of findings and a preliminary order," to provide CTI with

> notice of the substance of the relevant evidence supporting the complainant's allegations as developed during the course of the investigation. This evidence includes any witness statements, which will be redacted to protect the identity of confidential informants where statements were given in confidence; if the statements cannot be redacted without revealing the identity of confidential informants, summaries of their contents will be provided.

For whatever reason, the Secretary did not provide CTI with any witness statements, redacted or otherwise.[5] It may be-

---

3. Judge Jacobs contends that under the doctrine of constitutional avoidance it is inappropriate for me to rule on a constitutional question when the dispute might be resolved by answering a non-constitutional question. *Ante* at 475 – 76. Without doubt the doctrine of constitutional avoidance is important in our jurisprudence. Nonetheless, there is a difference between undertaking to establish a new constitutional standard and determining whether a set of facts satisfies a constitutional standard that has already been established by the Supreme Court. In this case, the relevant constitutional standard was established by the Court in *Brock*. My reasoning, which is that the Secretary failed to give CTI "notice of the substance of the relevant supporting evidence" against it, *Brock*, 481 U.S. at 264, 107 S.Ct. 1740, simply applies that standard. Where the choice is between resolving a statutory conundrum for which Congress has failed to provide any clear answer, and the

application of a pre-existing constitutional standard to the facts of this case, I believe that the doctrine of constitutional avoidance plays a smaller role.

4. Judge Straub asserts that the June 24 letter describes evidence which tends to rebut CTI's claim that Bechtel was fired for economic reasons. *See* Dissenting Op. at 489. I take no position as to whether in this letter the Secretary provided CTI with adequate notice of evidence on this particular point. Even if Judge Straub's assertion is correct, neither in this letter nor elsewhere did the Secretary provide CTI with notice, as *Brock* requires, of the evidence supporting Bechtel's allegation that he was terminated for engaging in whistleblowing activities.

5. An OSHA supervisor ordered the investigator in the case to provide CTI with "complete statements from complainants." The investigator did not do so.

though I express no view on this question-that summaries of witness statements, redacted to maintain the confidentiality of witnesses' identities, are consistent with *Brock's* requirements. But even assuming this to be the case, the summaries must be sufficient to provide an employer with reasonable notice of the evidence against it-a standard that was not satisfied here. Moreover, confidentiality interests cannot explain the Secretary's failure to provide CTI with copies, or even coherent summaries, of Bechtel's own statements, as his identity as a source of complaints about his employer was known.

While I agree with Judge Straub that violation of agency regulations does not, in and of itself, suffice to establish a due process violation, in this case the Secretary's failure to follow its own regulations resulted in a process that did not meet the

requirements of *Brock.*[6] Accordingly, I join Judge Jacobs, although for different reasons, in voting to vacate the preliminary injunction and remand to the district court for an order of dismissal.

STRAUB, Circuit Judge, dissenting from the result.

The questions before us are (1) whether, under the whistleblower provisions of the Sarbanes–Oxley Act of 2002, when the Department of Labor ("Department") finds sufficient cause to order that an employee be reinstated but the employer flouts this order, we have jurisdiction to enforce the order; and, if so, (2) whether, in this case, the procedure followed by the Department in finding sufficient cause and ordering reinstatement constituted due process. The District Court answered

**6.** Bechtel argues that there cannot have been a due process violation because CTI has not been deprived of any property interest. A property interest under the Fifth Amendment is "created ... by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Such a property interest can be created, pursuant to state law, through an implied contract. *Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). However, just because a property right exists under state law does not mean that a denial of that right constitutes a due process violation. Rather, "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Ezekwo v. New York City Health & Hospitals Corp.,* 940 F.2d 775, 782 (2d Cir. 1991) (internal quotation marks omitted).

In *Brock,* Roadway asserted a property interest deriving from the collective bargaining agreement with its employees' union, and a more general property interest in the "right to discharge an employee for cause." *Brock,* 481 U.S. at 260, 107 S.Ct. 1740. There the Secretary conceded "that the contractual right to discharge an employee for cause constitutes a property interest protected by the

Fifth Amendment" and the Court "accept[ed] the Secretary's concession." *Id.* at 261 & n. 2, 107 S.Ct. 1740. In *United States v. International Brotherhood of Teamsters,* 3 F.3d 634, 637 (2d Cir.1993), this court, relying on *Brock,* held that the right to discharge an employee for cause is a property interest protected by the Due Process Clause.

CTI argues that under Connecticut law it had the right, derived from an implied contract of employment, to discharge Bechtel with or without cause, and that this constitutes a property interest for purposes of the Fifth Amendment. I agree. The Connecticut Supreme Court has explained that "all employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment" and when that employment relationship is for an indefinite term "an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, job responsibilities and the like." *Torosyan v. Boehringer Ingelheim Pharm., Inc.,* 234 Conn. 1, 13–14, 662 A.2d 89 (1995). Just as the right to discharge an employee for cause is a property interest protected under the Due Process Clause, the right to discharge an employee with or without cause is a protected property interest.

both questions in the affirmative, and ordered Competitive Technologies, Inc. ("CTI") to reinstate Bechtel pursuant to the Department's order.

My colleagues, for different reasons, conclude that the case should instead be dismissed. Judge Jacobs finds that we do not have jurisdiction to enforce preliminary orders, whereas Judge Leval finds that the Department failed to provide CTI with due process. Because I find that the statute-though internally inconsistent-is best read to provide jurisdiction, and that the Department's procedure did not violate CTI's due process rights, I would affirm the District Court's injunction. I note that, because of the form our disposition of the case has taken, there is no majority rule of law from which I need dissent.

## I. Jurisdiction

Congress enacted the Sarbanes–Oxley Act of 2002 ("Act") in response to an acute crisis: Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy. Congress recognized that the problem was an intractable one, and that a number of strong enforcement tools would be necessary-from new regulations and reporting requirements, to expanded oversight, to new criminal provisions. Congress also recognized that for *any* of these tools to work, the law had to protect whistleblowers from retaliation, because "often, in complex fraud prosecutions, ... insiders are the only firsthand witnesses to the fraud." S.Rep. No. 107–146, at 10 (2002). Congress therefore made whistleblower protection central to the Act, creating a procedure whereby wrongfully discharged

employees can seek redress, including *immediate* preliminary reinstatement, first through the Department of Labor and then through the courts.

The text of the Sarbanes–Oxley Act, when read as a whole and in light of this urgent statutory purpose, firmly supports our exercise of jurisdiction to enforce the Secretary of Labor's ("Secretary") preliminary reinstatement order. Paragraph 42121(b)(2) of Title 49 of the United States Code provides that, if an individual files a whistleblower complaint and the Secretary, after investigating, finds reasonable cause to believe that a violation has occurred, "the Secretary *shall* accompany the Secretary's findings with a preliminary order providing the relief prescribed by paragraph (3)(B)" (emphasis added). Subparagraph (3)(B), in turn, *requires* the Secretary to provide certain relief if she finds, after a full investigation, that a violation occurred; among other relief, the Secretary *must* order the employee's reinstatement. Finally, subparagraph (5) authorizes the Secretary to bring an action in district court to enforce "an order issued under paragraph (3)" against a non-compliant employer, and subparagraph (6)(A) authorizes a similar action by the employee. Although an order is not necessarily "issued under" a provision simply because it provides "the relief prescribed by" that provision, I conclude that Congress intended to equate the two for purposes of mapping out judicial enforcement procedures.

Such a reading of paragraph (2) is necessary to make sense of the overall statutory scheme. The text of the statute makes clear that immediate reinstatement is paramount, which cuts against any interpretation that would allow an employer to ignore a reinstatement order with impunity.[1] To begin with, the statute requires

1. At oral argument, none of the parties was aware of any alternative mechanisms avail-

the Secretary to respond promptly to a complaint, deciding within 60 days whether reasonable cause exists. 49 U.S.C. § 42121(b)(2). If the Secretary does find reasonable cause, she must issue a preliminary reinstatement order, and this order has immediate effect notwithstanding any subsequent objections and requests for an administrative hearing by the employer. *Id.* ("The filing of ... objections shall not operate to stay any reinstatement remedy contained in [a] preliminary order.") Paragraph (b)(2) then provides for "expeditious[ ]" hearings upon the filing of any objections, presumably in large part to minimize the burdens on the employer of preliminary reinstatement before the merits are fully determined.

These provisions, taken together, reflect Congress's sense that timely reinstatement is essential to prevent the chilling effects of employer retaliation. Congress's firm language would be rendered entirely ineffective if we interpreted the Act in such a way that courts had no power to enforce administrative orders of reinstatement. *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant" (citations omitted)).[2]

The importance of *effective* preliminary reinstatement is plain not simply from the statute's mandatory language and strict deadlines but also from the purpose of the

statute as a whole. *See Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior,* 228 F.3d 82, 89 (2d Cir.2000) (where text of statute is ambiguous, we must construct an interpretation consistent with the primary purpose of the statute as a whole), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1732, 149 L.Ed.2d 657 (2001). Congress made clear, in enacting the Sarbanes–Oxley Act, that it viewed corporate whistleblowers not simply as good guys who deserve reward but also as useful-indeed essential-combatants against corporate malfeasance.

The Senate Judiciary Committee's report on the Act, for example, listed whistleblower protection as one of three main purposes of the Act (alongside criminal liability for wrongdoers and bars to bankruptcy discharge). S.Rep. No. 107–146, at 2 (2002) ("Senate Report"). In the "Background and Need for Legislation" section of the Senate Report, which narrated the epic demise of Enron, the Committee explained that the cover-up efforts of Enron's management included "discourag[ing] at nearly every turn" attempts by "employees at both Enron and [its auditor] Andersen ... to report or 'blow the whistle' on fraud," The Senate Report concluded that a "culture, supported by law," existed at Enron and related companies:

> that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally. This 'corporate code of silence' not only hampers investigations, but also creates a

---

able to the Secretary to immediately enforce her orders.

**2.** Admittedly, my reading of the Act is in some tension with other language in section 42121–namely, paragraph 42121(b)(3)'s heading ("Final order") and paragraph 42121(b)(4)'s provision that "[a]ny person adversely affected or aggrieved by an order issued under paragraph (3) may obtain review of the order [in a Court of Appeals]." These tensions sug-

gest that Congress may not have specifically considered the possibility that employers would flout or judicially challenge preliminary reinstatement orders. As set forth above, however, there is no possible reading that will make perfect sense of every aspect of the statute, and I have chosen the one that, in my view, leaves the statutory text and purpose most intact.

climate where ongoing wrongdoing can occur with virtual impunity. The consequences of this corporate code of silence for investors in publicly traded companies, in particular, and for the stock market, in general, are serious and adverse, and they must be remedied.

*Id.* at 5. The Committee also recognized the importance of these employees to any attempt to enforce new safeguards: "often, in complex fraud prosecutions, these insiders are the only firsthand witnesses to the fraud. They are the only people who can testify as to 'who knew what, and when,' crucial questions not only in the Enron matter but in all complex securities fraud investigations." *Id.* at 10.

The language and history of the Act, then, evince a strong Congressional preference for reinstatement as a means of encouraging whistleblowing.[3] Congress's preference, moreover, makes eminent sense. The Act's provision for *immediate* orders of preliminary reinstatement encourages whistleblowing, by assuring potential whistleblowers that they will remain employed, integrated in the workplace, professionally engaged, and well-situated in the job market; such orders also facilitate whistleblowing, by enabling whistleblowers to continue on as observers and potential witnesses to corruption. Moreover, when a whistleblower is immediately reinstated, this assures his co-workers that they are protected and thereby encourages them to come forward as well. The alternative is likely to discourage initial whistleblowing and, where a whistleblower has been removed pending the administrative and judicial processes, to send a chilling signal to co-workers who notice the whistleblower's sudden (and to all appearances permanent) disappearance. As the Supreme Court explained in considering an analogous whistleblower provision in the Surface Transportation Assistance Act of 1982:

Congress ... recognized that the employee's protection against having to choose between operating an unsafe vehicle and losing his job would lack *practical effectiveness* if the employee could not be reinstated pending complete review. The longer a discharged employee remains *unemployed,* the more devastating are the consequences to his personal financial condition *and prospects for reemployment.* Ensuring the eventual recovery of backpay may not alone provide sufficient protection to encourage reports of safety violations.

*Brock v. Roadway Exp., Inc.,* 481 U.S. 252, 258–59, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (emphasis added).

Based on these same statutory and policy considerations, the Secretary has promulgated 29 C.F.R.1980.113, which provides that:

[w]henever any person has failed to comply with a preliminary order of reinstatement or a final order or the terms of a settlement agreement, the Secretary or a person on whose behalf the order was issued may file a civil action seeking enforcement of the order in the United States district court for the district in which the violation was found to have occurred.

This agency rule, while by no means authoritative over this Court, is entitled to

---

**3.** While I agree with Judge Leval that nothing in the legislative history speaks *specifically* to the enforceability of preliminary orders, the history does make plain Congress's preference for immediate reinstatement whenever probable cause exists, which ought to inform our attempt to reconcile apparently conflicting statutory language in determining whether, in cases where an employer chooses to flout a preliminary order, we have jurisdiction to enforce that order to preserve the status quo.

some minimal deference based on the Secretary's experience enforcing the Act and on the need for national uniformity. *United States v. Mead Corp.*, 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

Notwithstanding these considerations, my esteemed colleague, Judge Jacobs, makes three policy arguments against jurisdiction. I address them in turn. First, Judge Jacobs argues that any hardship resulting from an employer's refusal to reinstate a complainant is mitigated by the prospect of judicial review if the Secretary fails to issue a final decision within 180 days. However, when compared with the statute's clear scheme of immediate reinstatement (in the ordinary case where the employer complies with the Secretary's order), the remote prospect of reinstatement *180 days plus one legal action later* hardly seems like a robust incentive to report wrongdoing. Moreover, Judge Jacobs's interpretation would leave whistleblowers under AIR21, which contains identical review language *except* for the 180–day provision, remediless.

Judge Jacobs's second and third arguments are similarly unavailing. As for the argument that preliminary orders should not be enforced because they rest on a "tentative and inchoate" basis, *see ante*, at 474, preliminary relief is often based on a finding of "reasonable cause" or a "prima facie case." More importantly, Congress is entitled to make the policy decision, as it has here, that, where an employee has made out a substantial claim, a balance of harms analysis favors forced reinstatement. *Brock*, 481 U.S. at 259, 107 S.Ct. 1740 (upholding an analogous preliminary reinstatement provision, coupled with reasonable cause requirement and efficient

post-reinstatement procedures, as a "legislative determination" reflecting a sufficient "balancing of the relative interests of the Government, employee, and employer"). At any rate, the harm to the *employer* feared by Judge Jacobs is minimal because, even where an employee makes out a prima facie case, the Secretary must halt her investigation "if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of [whistleblowing] behavior." 49 U.S.C. § 42121(b)(2)(B)(ii).

Judge Jacobs's final argument is that deferred jurisdiction helps to "ensure that appeals work their way through the administrative system before the federal courts become involved" and helps to avoid the potential chaos of multiple actions being filed at multiple stages in the administrative process. *Ante*, at 474. However, Congress has made clear that it wants employees reinstated *while*, not after, the administrative process goes forward. Nor does any chaos ensue from immediate enforcement because, as explained below, our task at this stage is not to assess the merits of the Secretary's determination but merely, after assuring ourselves that due process has been afforded, to give it effect. Indeed, preliminary or interim reinstatement orders issued under other whistleblower statutes have been enforced by this Court, with no dire effects. *See Martin v. Yellow Freight Sys., Inc.*, 793 F.Supp. 461 (S.D.N.Y.1992) (enforcing *interim* reinstatement order issued under the Surface Transportation Assistance Act of 1982), *aff'd*, 983 F.2d 1201 (2d Cir. 1993).[4]

---

4. Additionally, Judge Jacobs suggests that immediate enforcement might result in a "rapid sequence of reinstatement and discharge and a generally ridiculous state of affairs." *Ante*, at 474. There is no dispute, however, that

*Congress* provided for immediate reinstatement regardless of whether the employee ultimately prevailed. At any rate, the scenario Judge Jacobs presents is hardly more "ridicu-

As set forth above, jurisdiction is appropriate and expedient; the alternative would undermine a key element of the Sarbanes–Oxley Act.

## II.  Due Process

.My other esteemed colleague, Judge Leval, votes to dismiss the case even *if* we have jurisdiction because he concludes that the Department's preliminary reinstatement order rested on a flawed procedure that violated CTI's right to due process. With respect, I disagree.

The lead-and practically the only-case on this issue is *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987). *Brock* held that:

> minimum due process for the employer in this context requires notice of the employee's allegations, notice of the substance of the relevant supporting evidence, an opportunity to submit a written response, and an opportunity to meet with the investigator and present statements from rebuttal witnesses. The presentation of the employer's witnesses need not be formal, and cross-examination of the employee's witnesses need not be afforded at this stage of the proceedings.

*Id.* at 264, 107 S.Ct. 1740. Because in *Brock* the Secretary had given the defendant employer *no* information about the evidence against it or the basis for its preliminary finding against the employer, the Supreme Court did not have occasion to elaborate on the above standard before concluding that the Department had not complied with due process requirements. Conversely, in what may be the only other case to analyze the due process requirements for preliminary whistleblower reinstatement orders, *Martin v. Yellow Freight Sys., Inc.*, 793 F.Supp. 461

(S.D.N.Y.1992) (enforcing *interim* reinstatement order issued under the Surface Transportation Assistance Act of 1982), *aff'd*, 983 F.2d 1201 (2d Cir.1993), the district court found due process *easily* satisfied because the employer had received a full hearing on the merits. Neither case, therefore, suggests a clear-cut answer to the question before us.

*Brock*, however, does offer some guidance. To begin with, the *Brock* Court explained that, in determining how much process is due, courts must weigh three sets of "substantial" interests: 1) the government's interest in encouraging whistleblowing, 481 U.S. at 262, 107 S.Ct. 1740; 2) the employer's interest in controlling the makeup of its staff, *id.* at 263, 107 S.Ct. 1740; and 3) the employee's interest in his livelihood (which depends not merely on receiving backpay but also on being able to find another job), *id.* Although an employer's interests must be protected by a pre-reinstatement investigative procedure that ensures a minimum degree of reliability, after a certain point the value of additional reliability is outweighed by the cost of "extending inordinately the period in which the employee must suffer unemployment." *Id.* at 266, 107 S.Ct. 1740. Ultimately, in the context of whistleblower actions, the inquiry boils down to whether "the prereinstatement procedures establish a reliable initial check against mistaken decisions, and complete and expeditious review is available." *Id.* at 263, 107 S.Ct. 1740 (quotation omitted).

Judge Leval finds that the Department's investigation fails the *Brock* test because "CTI was not given reasonable notice of the evidence"-as opposed to the allegations-"against it." Concurring Op. at [14–15]. My conclusion to the contrary is based largely on the Department's initial letter to CTI ("Notice"), dated June 24,

lous" than a statutorily-mandated preliminary order that is utterly unenforceable.

2004, which (in four pages of small, single-spaced print) provided CTI with a highly detailed summary and analysis of the allegations and evidence against it. In addition, the Department gave CTI "a copy of Bechtel's initial complaint, a description of his allegations, and opportunities to submit written responses to those allegations[,] to present statements from rebuttal witnesses," and to meet with investigators. Concurring Op. at 480.

The Notice, first, set out exactly what Bechtel's alleged whistleblowing activities were and when they occurred. In brief, Bechtel, a Vice President at CTI, raised concerns about CTI's alteration, to avoid SEC disclosure, of its employee "incentive compensation plan," under which employees received a share of incoming revenue. Bechtel also stated his opinion that CTI was illegally concealing various oral agreements to compensate inventors, salespersons and attorneys with a percentage of the revenue-anywhere from 10 % to 70 %- from specific projects they helped realize, even though these agreements would materially affect CTI's net profits and losses. The Notice detailed Bechtel's allegation that, on March 14, 2003, he (and Wil Jacques, a colleague and co-complainant who has since settled with CTI) met privately with CTI's Chief Executive Officer, John Nano, and agreed to sign off on a SEC report, albeit with a written reservation from Jacques, in return for a performance review for Bechtel and a promised raise for Jacques.

The Notice set forth specific alleged acts of retaliation by Nano against Bechtel and Jacques, culminating in their termination on June 30, 2003, ostensibly for poor performance. The Notice discussed CTI's admitted lack of documentary evidence that Bechtel or Jacques performed poorly, as well as the *evidence* to the contrary (in the form of annual bonuses, positive perform-

ance reviews, and an enthusiastic memorandum from Nano to Jacques). The Notice then discussed CTI's assertion that it had economic reasons for firing Bechtel and Jacques. The Notice cited to *evidence* to the contrary, *i.e.*, the fact that CTI had replaced Bechtel and Jacques with "consultants" who held titles of Vice President, derived their entire income from CTI, functioned like regular employees, and at the time of the Notice had not produced significant revenues.

Notwithstanding the specificity of this letter, Judge Leval finds that the Department provided CTI only with allegations, not "evidence" (as that term was used in *Brock*). In so finding, Judge Leval focuses on what he calls the "mishmash" of a witness summary provided to CTI in lieu of full or redacted witness statements. Concurring Op. at 481 & n. 2 (quoting the summary in full). While I agree that this summary is not a masterwork of drafting, it does provide a straightforward summary of what witnesses said about the main contested issue in the case: *i.e.*, whether Nano fired Bechtel for legitimate business reasons. It is true that, under Department regulations, prior to issuing a preliminary order, the Secretary:

> will ... contact the named [respondent] to give notice of the substance of the relevant evidence .... includ[ing] any witness statements, which will be redacted to protect the identity of confidential informants where statements were given in confidence; if the statements cannot be redacted without revealing the identity of confidential informants, summaries of their contents will be provided.

29 C.F.R. § 1980.104(e). However, it may well be that the Secretary was justified in providing only witness summaries; given that CTI only had approximately seventeen employees, any disclosure of witness statements (even in a reasonably redacted

form) might have revealed the witnesses' identities. Even if the Secretary should have provided statements under § 1980.104(e), this fact alone could not constitute a due process violation. *Torres–Rosado v. Rotger–Sabat,* 335 F.3d 1, 10 (1st Cir.2003) ("An agency's failure to follow its own rules may be significant in administrative law, but the federal Due Process Clause does not incorporate the particular procedural structures enacted by state or local governments.").

From other documents in the record, we know that CTI responded to the Notice on July 14, 2004; that the Department responded in turn on November 3, 2004; and that CTI submitted further information on November 15, 2004–information which the Secretary later characterized as "lengthy but largely non-responsive." Only as of February 2, 2005, after numerous communications between the Secretary and CTI and after investigators met twice with CTI's General Counsel and outside counsel, did the Secretary issue her findings of reasonable cause and her preliminary reinstatement order.

The Secretary's February 5, 2005, letter engaged substantively with CTI's defenses. The letter explained that CTI's defense, which had focused on Bechtel's failure to bring in new revenue, was contradicted by its own SEC filings, which reveal a "business model" under which Bechtel's job was not to generate short-term income but rather "to close transactions that would create future, recurring income streams-that is, to obtain licenses." In this respect, the Department noted "that Bechtel and Jacques obtained at least three licenses during their employment," a record that the Department found, based on its investigation, "[could not] be characterized as [a] poor performance." The Department also restated its earlier observation that CTI did not ap-

pear to have profited financially in any way from its replacement of Bechtel and Jacques with full-time Vice President "consultants."

In my view, this record reflects a methodical investigation and ample notice to CTI of the evidence, as well as the allegations, against it. Whether or not the Department, in an ideal world, should have provided any further information to CTI, its investigation constituted "a reliable initial check against mistaken decisions," *Brock v. Roadway Exp., Inc.,* 481 U.S. 252, 263, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (quotation omitted), and therefore merits enforcement.

## CONCLUSION

As set forth above, I would exercise jurisdiction and affirm the District Court's injunction that CTI reinstate Bechtel pending the completion of the Department's investigation. Accordingly, I respectfully dissent from the result reached today.